# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

**ROBIN PLUMMER,**

                                      **Case No. C-3-06-094**

                **Plaintiff,**

**-vs-**

                                     **Judge Thomas M. Rose**

**THE HARTFORD LIFE INSURANCE CO.,**

                **Defendant.**

_____

### ENTRY AND ORDER REINSTATING LONG TERM DISABILITY BENEFITS TO ROBIN PLUMMER; GRANTING PLUMMER'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. #17) AND OVERRULING HARTFORD'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. #16)

_____

This cause arises from the disability of Plaintiff Robin Plummer ("Plummer"). Before becoming disabled, Plummer was employed by Kmart as a pharmacist. While employed at Kmart, Plummer was provided long term disability benefits under Group Long Term Disability Insurance Policy No. SRE83099256 (the "Policy"). The Policy was issued to Kmart by Continental Casualty Company ("CNA"). CNA administered the Policy until late 2003 when Defendant Hartford Life and Accident Insurance Company ("Hartford") assumed responsibility for administration of the Policy.

In February of 1998, Plummer began to experience pain in her lower back. She ceased working at Kmart on July 20, 1998 and, after receiving disability benefits from Kmart for a period of time, applied to CNA for disability benefits under the Policy. This application is not included in the Administrative Record ("AR") so the date she applied cannot be ascertained by

the Court. However, on June 24, 1999, CNA acknowledged receipt of Plummer's claim. The screening referral sheet indicates that Plummer's claim was received on June 18, 1999.

On July 21, 1999, CNA informed Plummer that her disability claim was approved with benefits to begin on January 20, 1999. In 2004, Hartford reviewed Plummer's record and ultimately decided to terminate her long term disability benefits as of February 1, 2005. Plummer unsuccessfully appealed this decision and ultimately filed the Complaint that is now before the court.

Count I of Plummer's Complaint is an ERISA claim for long term disability benefits. Count II is for attorneys' fees and costs.

The Sixth Circuit has directed that claims regarding the denial of ERISA benefits are resolved using motions for judgment on the administrative record. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). Now before the Court are Plummer's and Hartford's motions for judgment on the administrative record. (Docs. # 16 and 17.) The AR[1] has been filed and both Parties have filed responses. (Docs. #19 and 20.)

Hartford's Memorandum In Support of Judgment On the Administrative Record exceeds twenty pages in violation of Court rules and Plummer's Response To Defendant's Motion for Judgment On the Administrative Record was not filed by the date set by the Court. However, in the interest of providing justice to the Parties, both will be considered. Therefore, the motions for judgment on the administrative record are now ripe for decision.

---

[1]The AR filed in this case does not include pages 266 through 316, and one page between PLUM 670 and 671 is not Bates stamped.

A factual background will first be set forth. The factual background will be followed by the standard of review for claims to recover benefits due under terms of a plan subject to ERISA and an analysis of the cross motions for judgment on the administrative record.

## I.      FACTUAL BACKGROUND

Plummer was employed at Kmart from September 9, 1988 to July 19, 1998. (AR (hereinafter "PLUM") 968.) During the relevant time, Plummer was working in the position of pharmacist/manager. (PLUM 550.)

As a pharmacist/manager at Kmart, Plummer was responsible for overseeing the operation of the pharmacy department including customer service, profitability, investment control and compliance with federal, state and local laws, regulations and Company policies and procedures. (PLUM 892.) She was also responsible for supervising the work of the pharmacy technicians and customer service team members and for receiving and filling prescriptions. (Id.)

Kmart's job description for Plummer required, among other things, repetitive standing, bending, stooping, kneeling, lifting, stretching and reaching. (Id.) The job description used by Hartford for evaluation purposes classified the pharmacist position as "light" and identified the following as time spent on physical demands: sitting - 5%; standing - 70%; walking - 25%; bending - 10%; and reaching - 10%. (PLUM 823.)

## A.      Relevant Policy Provisions

The Policy provides an elimination period of six months provided the employee is considered totally disabled by the Kmart Disability Claims Administrator and has received salary continuation payments from the Kmart Disability Pay Policy. (PLUM 322.) Those covered are not eligible to receive benefits from the Policy during the elimination period. (PLUM 328.)

The Policy defines "disability" or "total disability" as when the insured employee, because of injury or sickness, is:

> (1) continuously unable to perform the *Substantial and Material duties* of the Insured Employee's *Regular Occupation*;
>
> (2) under the regular care of a legally qualified Doctor other than the Insured Employee; and
>
> (3) not Gainfully Employed in any occupation for which the Insured Employee is or becomes qualified by education, training or experience.

(PLUM 337.) The policy also provides a different definition of "disability" or "totally disabled" that is applicable after the Monthly Benefit has been payable for the Insured Employee Occupation Period shown in the Summary of Benefits. (Id.) However, in the case of the Policy issued to cover Kmart's employees, the Summary of Benefits includes a "Maximum Period Payable" but does not include an Insured Employee Occupation Period. (PLUM 322.)

The Policy also provides for the type of information a claimant must submit to be eligible to receive long term disability benefits. Relevant to this matter, the Policy requires the following proof of disability:

> 4. Proof that *You* are receiving *Appropriate and Regular Care* for *Your* condition from a *Doctor*, who is someone other than *You* or a member of *Your immediate family*, whose specialty or expertise is the most appropriate for *Your* disabling condition(s) according to *Generally Accepted Medical Practice*.
>
> 5. Objective medical findings which support *Your Disability*. Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for *Your* disabling condition(s).
>
> 6. The extent of *Your Disability*, including restrictions and limitations which are preventing *You* from performing *Your Regular Occupation*.

(PLUM 333.) Appropriate and regular care is defined in the Policy as "regularly visiting a Doctor as frequently as medically required to meet *Your* basic health needs." (PLUM 337.)

-4-

Further, "[t]he effect of the care should be of demonstrable medical value for *Your* disabling condition(s) to effectively attain and/or maintain *Maximum Medical improvement*." (Id.)

In addition to describing the type of information that must be provided for initial coverage, the Policy indicates that the insured may be asked to submit proof of continuing disability and proof of continuing to receive *"Appropriate and Regular* care of a *Doctor*." (PLUM 333.) This proof of continuing disability may be requested "only as often as *We* [the insurer] feel reasonably necessary." (Id.)

Finally, the version of the Policy that is presumably provided to the insured indicates that the insurer has the right to have a doctor examine the insured "as often as reasonably necessary while the claim continues" and that "failure to comply with this examination will suspend or terminate benefits" unless the insurer agrees that the insured has "a valid and acceptable reason for not complying." (PLUM 334.) No mention is made of an independent medical examination ("IME"). However, another version of the Policy that is part of the AR goes much further. This version indicates that disability benefits will not be paid for any period for which the insured refuses to have an IME when required by the insurer, for any period for which the IME is not received by the insurer and for any period for which the required IME does not substantiate medical evidence of total disability. (PLUM 352.)

**B.      Procedural History**

Plummer began to experience pain in her lower back in February of 1998. (PLUM 957.) She related the beginning of her back pain to working twelve hours per day at Kmart. (PLUM 899.) Plummer left the employment of Kmart on July 20, 1998. (PLUM 968.)

Plummer received full disability pay from Kmart from July 20, 1998 until January 19, 1999. (Id.) Prior to and during this time she was evaluated and treated by Dr. Seymour. (Id.) Plummer had been referred to Dr. Seymour by Dr. Fronista, her general practitioner at the time. (PLUM 920.)

On July 7, 1998, Dr. Seymour initially concluded that Plummer had musculoskeletal low back pain with deconditioning syndrome. (PLUM 921.) He began outpatient therapy for truncal strengthening and stabilization. (Id.) Dr. Seymour saw Plummer again on July 22, 1998, and sent her for an MRI of the lumbosacral spine. (PLUM 922.) On July 23, 1998, Dr. Seymour concluded from the MRI performed on July 22, 1998, that Plummer had a mild central bulge of the intervertebral disc at the L4-5 level. (PLUM 259.)

At Kmart's request, Plummer was seen by Dr. Brown, M.D., on August 31, 1998, for an IME. (PLUM 926.) Dr. Brown reviewed the MRI (PLUM 923) and agreed with the finding of a mild central bulge of the disc at the L4-5 level causing minimal impingement on the ventral aspect of thecal sac. (Id.) Dr. Brown recommended an EMG of the right lower extremity to try to better delineate the source of Plummer's pain and concluded that Plummer was disabled from work. (PLUM 928.)

On September 4, 1998, Plummer again saw Dr. Seymour. (PLUM 928.) Dr. Seymour concluded that Plummer had not responded well to the chiropractic care that she had been receiving. (PLUM 929.) Dr. Seymour recommended a trial of epidural steroids and, after discussing Plummer's case with Kmart's insurer, concluded that an EMG was needed. (Id.) The EMG, performed on September 10, 1998, indicated acute posterior rami irritation at the L5-S1 level. (PLUM 931.)

On September 28, 1998, Plummer again saw Dr. Seymour. Dr. Seymour concluded that Plummer had a probable disk derangement at L4-5. (PLUM 932.) He planned the use of a warm "N" back brace, resumption of lumbar stabilization exercises and a third epidural steroid injection followed by a re-evaluation. (PLUM 932.)

After a visitation on October 15, 1998, Dr. Seymour concluded that Plummer had a degenerative disc at L4-5 and some mild L5-S1 nerve root irritation. (PLUM 933.) He referred Plummer to Dr. Amongero, an orthopedic spine surgeon. (Id.) Dr. Seymour also concluded that Plummer could not return to work at least through November 15, 1998. (PLUM 933.)

Plummer was then referred by Kmart to Dr. Gilliotte, M.D., for a second IME. (PLUM 935.) Dr. Gilliotte saw Plummer on October 30, 1998. (Id.) He agreed with the findings of the previous MRI and EMG. (PLUM 937.) Dr. Gilliotte noted that Dr. Amongero had recommended a discogram and that Plummer was concerned about this test because it carried significant risk. (PLUM 937.) Dr. Gilliotte concluded at the time that proceeding to any form of back surgery would be premature. (Id.) On November 5, 1998, Dr. Gilliotte recommended that Plummer not return to work. (PLUM 939.)

In October of 1998, Plummer was referred by Dr. Teeters, her chiropractor, to Dr. Goodall, D.O., at the Greene Memorial Hospital outpatient neurosurgical clinic. (PLUM 938.) Dr. Goodall examined Plummer, reviewed the MRI and concluded that a myleogram CT would be as effective as a discogram. (Id.) The lumbar myleogram and post-myleogram CT, performed on November 9, 1998, were negative. (PLUM 940.)

Dr. Goodall dismissed Plummer from the neurosurgical clinic on November 10, 1998 (PLUM 941) and followed up with Plummer on November 12, 1998. (PLUM 943.) Dr. Goodall

concluded that, although obvious frank nerve root compromise was not identified, Plummer had radicular pain. (Id.) Since Dr. Goodall had not found the cause of Plummer's radiculopathy, he suggested that she consider a second opinion at a major neurosurgical center. (Id.) He then referred her to the Mayo Clinic. (PLUM 944.)

Plummer was seen at the Mayo Clinic on November 23-25, 1998. (PLUM 952.) At the Mayo Clinic, Plummer underwent a series of examinations and tests. Dr. Dekutoski, of the Mayo Clinic, concluded that "there is no clear role for surgical intervention." (PLUM 949.) He recommended further chronic pain management evaluation and follow-up evaluation by her hometown treating physicians. (PLUM 949.) One of the doctors in the psychology department at Mayo found that Plummer exhibited depressive symptoms of frustration, irritability, some anhedonia, and hopelessness. (PLUM 945.) Dr. Hunt of the Mayo Clinic reported final diagnoses of back pain with radiation to the right posterior leg and previous hysterectomy. (PLUM 952.)

On December 10, 1998, Plummer returned to Dr. Gilliotte for a review and further guidance as to the next step. (PLUM 905-06.) Dr. Gilliotte reported that Plummer showed symptoms of depression. (Id.) He concluded that Plummer had back and right lower extremity pain which thus far had alluded to any definitive diagnosis. (Id.) Dr. Gilliotte then ordered a CT scan of the pelvis and a bone scan. (Id.) He also declined to pursue physical therapy at the time. (Id.)

Plummer saw Dr. Gilliotte again on January 12, 1999. (PLUM 908.) Dr. Gilliotte noted that Plummer was "about the same." (Id.) He recommended physical therapy and referred her to Dr. Demirjian for a pain management consultation. (Id.)

The next medical contact included in the AR is an IME performed by Dr. King, M.D., at Kmart's request. (PLUM 900-01.) Dr. King reviewed Plummer's prior examinations and treatments including those by Dr. Teeters, Dr. Gilliotte, Dr. Seymour and the Mayo Clinic. (Id.) Dr. King noted that Plummer had had epidurals and facet blocks with minimal relief. (Id.) He also noted that Plummer's CT discogram was positive at two levels: L4-5 and L5-S1 and that Plummer would be "seen and followed" by Dr. Amongero, a spine surgeon, to surgically decompress these two levels. (Id.) Dr. King concluded that Plummer was not able to function in the capacity of a "registered nurse" (???) and was unable to return to work. (Id.)

On April 6, 1999, Dr. Amongero performed a lumbar diskogram. (PLUM 258.) He found a normal contour and no symptoms at the L3-4 disc. (Id.) He also found posterior extension of contrast material in the annulus at L5-S1 and immediate severe pain. (Id.)

On June 19, 1998, Plummer had back surgery. (PLUM 662.) She had an anterior and posterior surgical fusion between L4 and the sacrum. (PLUM 252) Dr. Gilliotte reported to CNA that restrictions and limitations were to be developed by Dr. Amongero, Plummer's surgeon, and that she may be ready for part time work by January 1, 2000. (PLUM 887.) A lumbar CT scan on December 16, 1999, revealed the results of the surgery and that there may be centrally located clumped nerve roots or other soft tissue lesion in the spinal canal at the L4 and L5 levels. (Id.)

Plummer then submitted a claim for disability benefits to CNA that was received by them on June 23, 1999. (PLUM 697.) This application is not included in the AR.

On July 21, 1999, CNA informed Plummer that her claim had been approved and provided the monthly benefit amount. (PLUM 892.) The period from July 20, 1998, to January

20, 1999, was used to satisfy the Policy's six-month elimination period. (Id.) Following the

elimination period, Plummer began receiving $2878.73 monthly. (Id.)

The letter from CNA also informed Plummer that benefits under the Policy are payable

for 24 months if she is totally disabled from her own occupation and that benefits will continue

after 24 months only if she is totally disabled from any occupation. (Id.) However, the "any

occupation" language is not applicable to Plummer in accordance with the employee Plan

Summary that is included in the AR.

Plummer was next examined by Dr. Gilliotte on January 4, 2000. (PLUM 862.) As a

result, he continued to certify Plummer as disabled. (PLUM 871.) Dr. Gilliotte stopped her

physical therapy and suggested that she see Dr. Amongero regarding the results of the lumbar

CT scan. (Id.) He reported to CNA that Plummer was unable to stand, walk or sit for extended

periods and her estimated date to return to work was now July 1, 2000. (PLUM 871.)

Plummer was again examined by Dr. Gilliotte on June 16, 2000. (PLUM 842.) Dr.

Gilliotte reported to CNA that Plummer was in a pain management program and could not

currently perform the work of a pharmacist due to pain, depression and anxiety. (Id.) He also

reported that Plummer may begin work on March 1, 2001. (Id.)

Plummer was again examined by Dr. Gilliotte on September 5, 2000. (PLUM 833.) Dr.

Gilliotte reported to CNA that Plummer was in a pain management program and could not

currently perform the work of a pharmacist due to pain, depression and anxiety. (Id.) He reported

that Plummer continued to be disabled and may be able to return to work on March 1, 2001. (Id.)

On September 15, 2000, in response to a request from CNA, Dr. Gilliotte reported that

Plummer's function had not improved and that it would never improve enough for her to return

to full time work. (PLUM 809.) He reported that Plummer has chronic pain and would not tolerate any work environment unless she improves substantially. (Id.)

CNA then contracted with ProWork to determine Plummer's current physical/functional capabilities and to determine Plummer's ability to perform the pharmacist job. (PLUM 830.) The Functional Capacity Evaluation ("FCE") was scheduled to be conducted on November 15 and 16, 2000. (PLUM 820.) The FCE was discontinued on the first day following the musculoskeletal portion of the evaluation. (PLUM 812) Plummer was reported to be weeping throughout the evaluation and reported pain in her low back. (Id.)

On December 5, 2000, CNA again asked Dr. Gilliotte for his evaluation. He responded that there had been no improvement in Plummer and future improvement was uncertain. (PLUM 805.) The current treatment noted by Dr. Gilliotte was continued pain management, physical therapy and medications. (Id.)

On February 22, 2001, Plummer filed for social security disability benefits. (PLUM 733.) The Social Security Administration determined that she became disabled on July 20, 1998, and was entitled to social security disability benefits beginning February 2000. (Id.) Pursuant to the terms of the Policy, Plummer was required to reimburse CNA for social security payments received. (PLUM 739.)

Dr. Gilliotte again evaluated Plummer on September 26, 2001. (PLUM 700.) He found that she could not perform full time work and that she continued to have severe limits to her ability to sit, stand, walk and concentrate. (Id.)

On October 24, 2002, CNA offered Plummer a lump sum of $105,000 to settle her disability claim. (PLUM 684.) This offer was based upon the present value of Plummer's future benefits. (Id.) Plummer declined the offer. (PLUM 674.)

In late 2003, Hartford assumed responsibility for administration of the Policy. Hartford's case notes indicate that Dr. Fronista had examined Plummer on November 13, 2003, and concluded that Plummer was totally disabled with no marked change expected in the future. (PLUM 671.) The case notes also include Hartford's conclusion that "there is minimal supportive evidence on the file from 2001 through the present" and that a request will be made to Plummer to provide a current attending physician's statement and work and education history. (PLUM 671.) The AR also includes a Disability Claim Form submitted by Plummer on November 13, 2003, in which she reports that she cannot return to work until a new technique is developed to decrease pain and increase mobility. (PLUM 672.)

On June 1, 2004, Hartford asked Plummer for a "periodic update" of its records. (PLUM 668.) Plummer responded by completing a Claimant Questionnaire and an attending physicians's statement ("APS") dated July 28, 2004. (PLUM 659-65.) She reported that she had "arachnoiditis, severe back pain, can only be up for short periods when sitting down feet up and using ice, tens unit and medication" and that there had been no change in her condition. (Id.) She also reported that she had been treated by Dr. Fronista and Dr. Snow[2] within the last 18 months. (Id.) The APS diagnoses arachnoiditis and severe back pain and lists October 28, 2004, as the latest treatment date. (PLUM 662.) The APS also indicates that no treatment is available for this condition. (Id.)

_____

[2]Dr. Snow is a pain specialist who was associated with Dr. Fronista at the time.

-12-

Hartford then asked Dr. Fronista for copies of his office records for Plummer for January 2003 to the present. (PLUM 652.) Dr. Fronista's records indicate that he had seen her four times between August 7, 2003, and June 28, 2004, for various reasons. (PLUM 640-646.) Each of Dr. Fronista's visit sheets includes a diagnosis of arachnoiditis. (Id.)

On July 28, 2004, Hartford referred Plummer's claim to its Special Investigation Unit ("SIU"). (PLUM 635.) The claim was referred as a "Proactive." (Id.)

The SIU contracted with Dempsey Investigations, Inc. for surveillance of Plummer to determine her current activities and physical limitations. (PLUM 614.) The initial surveillance took place on Saturday August 14th, Sunday August 15th and Monday August 16th, 2004 (Id.) On August 14th and 15th, Plummer was not observed outside of her residence. (Id.) On August 16th Plummer was observed away from her residence for approximately thirty-nine minutes. (Id.) Plummer was observed traveling to a nearby cleaner's, a fast food restaurant and a department store. (Id.)  During this time, she was observed driving, walking, entering and exiting her vehicle, squatting, bending at the waist, reaching, lifting and pushing a shopping cart. (Id.) The observer noted that Plummer displayed a full range of motion and displayed no physical signs that would support her stated limitations. (Id.)

Hartford then requested further surveillance. The second surveillance took place on Sunday September 12 and Monday September 13, 2004. (PLUM 606.) On Sunday, Plummer was not observed outside of her residence. (Id.) On Monday, Plummer was observed away from the residence for approximately two hours. (Id.) Plummer traveled to a private residence, to a medical center, back to the private residence and then back to her residence. (Id.) During this time, she was observed and videotaped walking, bending at the waist, carrying a baby in a car

-13-

seat using her left and right hand, reaching and pulling, and driving approximately thirty miles round trip without any other adults in the vehicle. (Id.) According to the observer, Plummer walked in a normal manner and pace, displayed good range of motion and did not display any visible physical signs of discomfort. (Id.)

Following the surveillance, Plummer's claim was given to Hartford Investigator John Snow ("Snow"). (PLUM 596.) Snow then interviewed Plummer on October 21, 2004. (PLUM 541.) Plummer declined Snow's offer to view the video tapes. She did, however, indicate that she had been watching her granddaughter during the surveillance. (PLUM 66.) She indicated that she was watching her granddaughter because the child's mother had been beaten by the father of the child. (Id.) The older woman seen at the private residence was someone who occasionally watched the child. (Id.)

As part of the interview, Plummer was asked to describe her restrictions and limitations. (PLUM596.) She indicated that she was prevented from returning to work because of severe back pain caused by arachnoiditis and that this causes an inability to sit or stand for any extended period of time. (PLUM 53.) She also stated that she had the following restrictions and limitations: walk for about twenty or twenty-five minutes; stand for fifteen to twenty minutes at most and lift and carry items that weigh less than five pounds and push and pull something like an empty shopping cart on wheels. (Id.) Plummer also indicated that she could bend and twist at the waist, squat, kneel and reach to the front and side. (Id.) Finally, Plummer indicated that her condition has remained the same for the past six months and that the information on the claimant questionnaire dated July 28, 2004, remained the same. (Id.)

On October 26, 2004, Hartford sent copies of the surveillance to Dr. Fronista.[3] (PLUM 594.) Dr. Fronista was told that the surveillance supports a conclusion that Plummer's functionality exceeds his assessment. (Id.) He was asked to review and comment on the surveillance. (Id.) The AR does not include a response to this letter.

Hartford also scheduled an IME for Plummer with Dr. Klein, who is a board certified occupational medicine physician and family practitioner, and an independent medical examiner. (PLUM 591.) The IME was conducted on November 22, 2004. (Id.) Hartford asked Dr. Klein to determine what precludes Plummer from working and to determine her restrictions and limitations. (PLUM 580.)

Dr. Klein issued his initial report on that same day. (PLUM 574-77.) He examined Plummer and the medical records that had been provided by Hartford. (Id.) Dr. Klein concluded that Plummer presented herself as credible and having ongoing pain. (Id.) He also concluded that Plummer would presently be classified in the sedentary job description meaning that she could occasionally lift up to 10 pounds but would require frequent change of body position from standing, sitting and lying. (Id.)

After receiving Dr. Klein's initial report, Hartford sent Dr. Klein copies of the two surveillance videos, one taken on August 16, 2004 for a total of five minutes and one taken on September 13, 2004 for a total of approximately twelve minutes. (PLUM 559-60.) On December 17, 2004, Dr. Klein issued an addendum report. (Id.) In the addendum report, Dr. Klein first wrote what he saw in the videos. (Id.) He then indicated that Plummer is capable of performing

_____

[3]Although the letter indicates that it was the surveillance of Mrs. Fronista, presumably, it was the surveillance of Plummer.

at a higher level than she presented to him in her evaluation in November. (Id.) Specifically, Dr. Klein, based upon viewing the videos, believed that Plummer was capable of lifting up to twenty-five pounds on an occasional basis, was capable of frequently lifting up to ten pounds and was capable of standing and walking about as needed on a frequent basis. (Id.) This, according to Dr. Klein, would put Plummer in the light duty classification and capable of performing the duties of a pharmacist. (Id.)

Hartford then sent both of Dr. Klein's IME reports to Dr. Fronista. (PLUM 567.) In the letter dated January 3, 2005, Hartford concludes that Plummer has the capacity to work an 8-hour day at a light physical demand level and would be able to return to her own occupation as a pharmacist. (Id.) Hartford asked Dr. Fronista to agree with this assessment or, if not, to provide a statement addressing the "above" information and a copy of any information supporting Plummer's functional capacity. (Id.)

On January 20, 2005, Dr. Fronista responded. (PLUM 565.) Dr. Fronista told Hartford that Plummer has been his patient for about ten years and that he had been treating her for the usual colds and a bout with pneumonia. Dr. Fronista further indicated that Plummer's back problems have been treated by others and that he does not involve himself with her back anatomy and physiology except for prescribing analgesics for her symptoms. (Id.) Dr. Fronista concluded that he did not feel comfortable evaluating Plummer's state of disability. (Id.)

On February 1, 2005, Hartford notified Plummer that they were terminating her long term disability benefits effective February 1, 2005.[4] (PLUM 539-44.) Hartford indicated that it based its decision on policy language and the following information included in Plummer's file:

1. Claimant Questionnaire completed and signed by Plummer on June 28, 2004;
2. Work and Education History Form completed and signed by Plummer;
3. Authorization to Obtain and Release Information completed and signed by Plummer;
4. Medical records from Dr. Fronista, 01/01/02 through the present;
5. Attending Physician Statement of Disability completed by Dr. Fronista 06/28/04;
6. Independent Medical Examination performed 11/22/04;
7. Letter from Dr. Fronista dated 01/20/05;
8. Surveillance report and videotape from surveillance conducted by Dempsey Investigations, Inc. on 8/16/04;
9. Interview with Plummer on 10/21/04 conducted by Jack Snow of the Hartford; and
10. Employability Analysis Report completed 01/03/05.

Hartford based its decision on the IME and video surveillance and reviewed Plummer's file for employability.[5] (Id.) Taking into account physical limitations, Hartford concluded that Plummer has the level of education, experience, geographical location and work history to perform three occupations: Pharmacist, Pharmaceutical Sales Representative and Quality Assurance-Pharmaceuticals. (Id.)

Plummer was then referred to Dr. Gilliotte by Dr. Fronista. (PLUM 532.) Dr. Gilliotte had previously seen Plummer between 1998 and 2002 for back and leg pain. (Id.) Dr. Gilliotte examined Plummer on February 23, 2005. He reported that Plummer had complaints of constant low back pain and an intermittent heavy sensation and pinching sensation in her lower right extremity. (Id.) He also reported that Plummer was seeing a counselor, Steve White, to help her with some psychological adjustments issues. (Id.) Dr. Gilliotte concluded that Plummer had

---

[4]This letter, again, includes a definition of "any occupation" disability that does not apply to Plummer.

[5]The Employability Analysis Report is not a part of the AR.

stable chronic back and leg pain and that she was not physically capable of work. Dr. Gilliotte also concluded that he thought Plummer's history and physical findings were legitimate. (PLUM 533.)

Plummer then appealed Hartford's decision to terminate her long term disability benefits. (PLUM 531.) Along with an appeal letter dated May 6, 2005, Plummer's Counsel transmitted reports from Dr. Gilliotte and Steven White of Catholic Social Services both of which indicate full disability. (Id.) Dr. Gilliotte had examined Plummer most recently on February 23, 2005, and White had been treating Plummer on a regular basis since April 11, 2003.

Hartford then asked for Dr. White's treatment records which were provided on July 7, 2005. (PLUM 468.) Dr. White is a psychotherapist. (PLUM 534.) He concluded that Plummer is unable to sustain employment due to her mood disorders and anxiety disorder. (Id.)

Hartford then hired consulting physicians to conduct record reviews. (PLUM 464-65.) Dr. Robert L. Marks, M.D., conducted a medical record review (PLUM 452-59) and David F. Zakin, Ph.D., conducted a psychological record review (PLUM 439-47).

Dr. Marks reviewed Plummer's medical records, spoke with Dr. Gilliotte and determined that the "surveillance video reveals no evidence of significant functional impairment." (PLUM 459.) Dr. Gilliotte indicated that even patients with chronic back pain can perform tasks in an emergency which they normally could not perform. (PLUM 458.)

Dr. Marks concluded, in his report dated September 22, 2005, that, based upon the available documentation, Plummer is capable of performing the activities of a light work level (DOT classification). (PLUM 459.) The light work level entails occasional lifting of up to 20 pounds and some walking and standing. (Id.) He further concluded that Plummer does not

demonstrate any difficulties reaching above shoulder level and the only limitation relates to the necessity of a stool being available. (Id.)

Dr. Zakin reviewed Plummer's records and spoke with Mr. White. (PLUM 439.) Dr. Zakin also reviewed the surveillance videos and noted that Plummer reported that she was watching her granddaughter during the surveillance but did not do this on a regular basis. (PLUM 444.) Dr. Zakin also noted in his report, dated September 22, 2005, that Mr. White reports observing concentration problems but that Mr. White's treatment notes do not document any significant problems with concentration or memory and that no cognitive testing has been performed. (Id.)

Mr. White told Dr. Zakin that Plummer is unable to perform any type of work at this time based upon Major Depression. (PLUM 445.) Dr. Zakin determined that the surveillance video indicates under-reporting of symptoms. (PLUM 446.) He concluded that there is support for the diagnosis of an Axis I depressive condition but that there is not objective medical evidence that Plummer's depression is severe enough to cause occupational impairment. (PLUM 443.)

Hartford then denied Plummer's appeal. (PLUM 403-08.) In a letter dated October 4, 2005, Hartford denied the appeal and set forth its determination that Plummer no longer satisfies the Policy definition of disability. (Id.) In the letter, Hartford summarized the basis for its initial decision and addressed the additional information from Dr. Gilliotte and Mr. White. Hartford concluded that Dr. Marks did not offer any physical restrictions and limitations which would prevent Plummer from performing the alternative occupations identified in its February 1, 2005 letter transmitting its decision to terminate long term disability benefits. (Id.) Hartford also concluded based upon Dr. Zakin's Independent Psychological Record Review, that Plummer did

not suffer from a behavioral health impairment which would prevent her from performing the "alternative occupations" identified in the February 1, 2005 letter. (Id.)

Following denial of her appeal, Plummer brought the complaint that is now before the Court. The analysis next turns to the standard of review.

## II.     STANDARD OF REVIEW

A participant or beneficiary of an ERISA qualified plan may bring suit in federal court to recover benefits due under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). When an ERISA plan administrator's decision to deny benefits is brought before a court, the court engages in a de novo review of the decision unless the benefit plan gives the plan administrator discretionary authority to determine eligibility or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Where the plan administrator is given no discretionary authority by the plan, review by the court is de novo with respect to both the factual determinations as well as the legal conclusions of the plan administrator. *Id.* Where there is a clear grant of discretion, the court applies an arbitrary and capricious standard of review to the administrator's decision to deny benefits. *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994), *cert. denied*, 513 U.S. 1058 (1994).

The Sixth Circuit does not require a plan to use any magic words such as "discretionary" to create discretionary authority for a plan administrator in administering the plan. *Johnson v. Eaton Corp.*, 970 F.2d 1569, n.2 (6th Cir. 1992). Yet the Sixth Circuit has consistently required "a clear grant of discretion [to the administrator]" before replacing its duty to engage in de novo review with the arbitrary and capricious standard. *Wulf*, 26 F.3d at 1373. When considering

whether a clear grant of discretion is given, courts are to "focus on the breadth of the administrators' power - their 'authority to determine eligibility for benefits or to construe the terms of the plan." *Perez v. Aetna Life Insurance Co.*, 150 F.3d 550, 555 (6th Cir. 1998)(en banc)(citing *Block v. Pitney Bowes, Inc.* 952 F.2d 1450, 1453 (D.C.Cir. 1992), *cert. denied*, 531 U.S. 814 (2000).

The requirement to submit written proof of loss, by itself, does not confer discretionary authority. *Hoover v. Provident Life and Accident Insurance* Co., 290 F.3d 801, 808 (6th Cir. 2002); *Perez v. Aetna Life Insurance Co.*, 96 F.3d 813, 826 (6th Cir. 1996)(judgment vacated on other grounds). Also, language requiring "due written proof of loss" does not grant discretionary authority. *Napier v. Hartford Life Insurance Co.*, 282 F.Supp.2d 531, 534 (E.D.Ky. 2003). However, a requirement of "satisfactory proof" confers discretionary authority. *Perez*, 150 F.3d at 558. In addition, discretionary authority is granted where the plan administrator has the duty to "interpret the terms and conditions of the Plan." *Brown v. National City Corp.*, Case No. 97-6130, 1998 WL 787084 at *2 (6th Cir. Oct. 29, 1998). Discretionary authority is also granted where a claim is to be denied unless the plan administrator "allows such claim in full." *Id.* Finally, discretionary authority is granted where the disability is determined on the basis of medical evidence satisfactory to the insurer. *Miller v. Metropolitan Life Insurance Co.*, 925 F.2d 979, 984 (6th Cir. 1991).

A.      **Determination of the Standard of Review In this Case**

Hartford argues that its decision should be analyzed using the arbitrary and capricious standard of review. Plummer argues that a de novo standard applies because the policy does not

grant discretionary authority to Hartford to determine eligibility or to construe the terms of the plan.

In support of its argument, Hartford cites *Boone v. Liberty Life Assurance Company of Boston*, 161 Fed. Appx. 469 (6th Cir. 2006), for the proposition that the Sixth Circuit has analyzed policies that include a reservation of a right to require objective medical evidence of eligibility for disability benefits under the arbitrary and capricious standard. However, this argument is very misleading and not well founded.

In *Boone*, the Sixth Circuit says that the arbitrary and capricious standard is applied when the plan gives the administrator discretionary authority to determine eligibility. 161 Fed. Appx. at 472. It then sets forth the portions of the plan that are relevant to the issues before the court and not the portions of the plan relevant to its determination of the standard of review to apply. *Id.*

Had Hartford's Counsel conducted further research, it would have found that the policy at issue in *Boone* clearly grants discretionary authority:

> Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

*Boone v. Liberty Life Assurance Co. of Boston*, Case No. 1:04 CV 0088, Doc. #20, p. 12 (W.D.Mich Jul 2, 2004).

The Policy at issue here, and specifically the language cited by Hartford, provides no such grant of discretionary authority. The Policy does not grant Hartford the "breadth of administrators' power" necessary to confer a clear grant of discretion. Therefore, Hartford's decision to terminate Plummer's long term disability benefits will be reviewed de novo.

-22-

**B.     Application of De Novo Standard**

When conducting a de novo review, the court decides whether or not it agrees with the decision under review. *Myers v. Iron Workers District Council of Southern Ohio & Vicinity Pension Trust*, Case No. 2:04-CV-966, 2005 WL 2979472 at *1 (S.D.Ohio Nov. 7, 2005)(citing *Perry v. Simplicity Engineering*, 900 F.2d 963, 966 (6th Cir. 1990)). In doing so, the administrator's decision is accorded no deference or presumption of correctness. *Napier*, 282 F.Supp.2d at 534. "The court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits." *Id.* at 534-35. Finally, the de novo standard applies to both the factual determinations and the legal conclusions of the plan administrator. *Id.* Therefore, this Court must review the record to determine whether Hartford made the correct decision in terminating Plummer's long term disability benefits.

**C.     Administrative Record and Post Hoc Rationalizations Thereof**

The court's review is limited to the administrative record of the benefit determination absent a procedural challenge to the administrator's decision. *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609, 619 (6th Cir. 1998). There has been no procedural challenge in this case.

A court may consider only the evidence available to the administrator at the time the final decision was made. *Miller*, 925 F.2d at 986 (6th Cir. 1991). This includes consideration of what occurred during the administrative review and appeals process. *Id.* For example, a mental illness triggered by a physical injury should be addressed even if the mental illness is not included in the application for benefits and arises thereafter. *Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 511-12 (6th Cir. 2005).

-23-

Further, while reviewing the administrative record, the Court may not consider a post hoc explanation of an administrative body's decision. *University Hospitals of Cleveland v. Emerson Electric Co.*, 202 F.3d 839,  n.7 (6th Cir. 2000). Administrators and their attorneys are not permitted to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decision after the matter is in litigation. *Id.*

**D.      Conflicts of Interest**

Plummer argues that a conflict of interest exists in this case. When reviewing an administrator's decision, courts are guided by the impact of conflicts of interest. One such conflict of interest arises when a plan contracts with individuals to offer opinions. In this situation, the plan administrator has a clear incentive to contract with individuals who are inclined to find in its favor. *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 292 (6th Cir. 2005).

**E.      Medical Opinions**

The issue of the weight to be given to the opinion of Plummer's treating physicians also arises in this case. Plan administrators may not ignore the opinions of treating physicians but they are not required to give special deference to them. *Boone,* 161 Fed.Appx. at 473-74. Further, a plan administrator may not credit the opinion of a treating physician if the plan requires that the treating physician's opinion be supported by objective medical evidence and it is not. *Id.* at 473. Finally, when a plan administrator elects to rely upon the medical opinion of one doctor over that of another, the plan administrator's decision cannot be said to have been incorrect so long as it is possible to offer a reasoned explanation, based upon the evidence, for the decision. *McDonald v. Western-Southern Life Insurance Co.*, 347 F.3d161, 169 (6th Cir. 2003).

However, whether a doctor has physically examined the claimant is an issue to be considered. *Kalish,* 419 F.3d at 508. The failure to conduct a physical examination raises questions about the thoroughness and accuracy of the doctor's conclusions. *Id.*

**F.      The Receipt of Social Security Benefits**

Finally, the Parties discuss the treatment of the Social Security Administration's ("SSA's") decision to grant Social Security Benefits to Plummer. An SSA determination, while not binding, is also not meaningless. *Calvert*, 409 F.3d at 294. The SSA determination, at a minimum, may support the conclusion that an administrative agency charged with examining the claimant's records found support for the treating physicians' opinions. *Id.* Further, it is "inconsistent for a plan administrator to ignore the SSA's favorable determination, after the administrator had expressly requested the claimant to apply for SSA benefits." *Borys v. Metropolitan Life Insurance Co. MetLife Disability*, Case No. 03CV1162, 2005 WL 1037469 at * 6 (S.D.Ohio May 4, 2005)(citing *Whitaker v. Hartford Life and Accident Insurance Co.*, 404 F.3d 947 (6th Cir. 2005)); *see also*, *Calvert,* 409 F.3d at 294; *Pierce v. Kentucky Utilities Company's Long Term Disability Plan*, 357 F.Supp.2d 979, 989 (E.D. Ky. 2005). Having set forth a factual background and the standard of review for ERISA claims, the analysis next turns to the cross motions for judgment on the administrative record.

**III.      CROSS MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

A brief analysis of the factual background will first be set forth. This analysis is followed by an analysis of Hartford's decisions, an analysis of Hartford's arguments and Briefs and the conclusions.

**A.      Analysis of the Factual Background**

Plummer's last day as a pharmacist at Kmart was July 19, 1998. She ceased working due to severe pain in her lower back. Plummer began receiving disability pay from Kmart on July 20, 1998.

Plummer was initially treated for back pain by Dr. Seymour, to whom she had been referred by Dr. Fronista, her general practitioner. After some unsuccessful therapy, Dr. Seymour ordered an MRI which revealed a mild central bulge of the intervertebral disc at the L4-5 level. Dr. Brown, who conducted an IME at Kmart's request, confirmed this finding and recommended an EMG of the right lower leg to try to better delineate the source of Plummer's pain. Both Dr. Seymour and Dr. Brown concluded that Plummer was unable to work.

In September of 1998, Dr. Seymour concluded that Plummer had not responded to the chiropractic care that she was receiving. He recommended a trial of epidural steroids and also concluded that Plummer should have an EMG, which she did. The EMG indicated acute posterior rami irritation at the L5-S1 level.

After further therapy and another epidural steroid injection, Dr. Seymour determined that Plummer had a degenerative disc at L4-5 and some mild L5-S1 nerve root irritation. He concluded that Plummer could not yet return to work and referred her to Dr. Amongero, an orthopedic spine surgeon.

Next, at Kmart's request, a second IME was conducted by Dr. Gilliotte. Dr. Gilliotte examined Plummer and reviewed her medical records on October 30, 1998. He agreed with the findings from the previous MRI and EMG. He concluded that back surgery would be premature and also determined that Plummer could not yet return to work.

At about this same time, Plummer was referred to Dr. Goodall, D.O., at the Greene Memorial Hospital outpatient neurosurgical clinic by Dr. Teeters, her chiropractor. Dr. Goodall determined that a myleogram CT would be as effective as a discogram. The results of the myleogram CT and post-myleogram CT performed on November 9, 1998, were negative and Plummer was dismissed from the neurosurgical clinic. Dr. Goodall concluded that, although obvious frank nerve root compromise was not identified, Plummer had radicular pain. He suggested that Plummer consider getting a second opinion at a major neurosurgical center, which she did.

Plummer underwent a series of tests and examinations at the Mayo Clinic on November 23-25, 1998. Staff at the Mayo Clinic concluded that back surgery was not appropriate and recommended further chronic pain management evaluation and follow-up evaluation by Plummer's hometown treating physicians. A psychologist at the Mayo Clinic concluded that Plummer exhibited depressive symptoms of frustration, irritability, some anhedonia and hopelessness.

Upon her return from the Mayo Clinic, Plummer again saw Dr. Gilliotte. He concluded that Plummer had back and right lower extremity pain which had thus far avoided a definitive diagnosis. He then ordered a CT scan of the pelvis and a bone scan. He also reported that Plummer exhibited symptoms of depression. Finally, Dr. Gilliotte referred Plummer to Dr. Demirjian for pain management.

Kmart then obtained a third IME that was conducted by Dr. King. Dr. King noted that Plummer's CT discogram was positive at two levels: L4-5 and L5-S1. He concluded that Plummer was unable to function as a registered nurse[6] and was unable to return to work.

In April of 1999, Dr. Amongero, Plummer's orthopedic spine surgeon, performed a lumbar diskogram. He found no symptoms at the L3-4 disc but he did find posterior extension of contrast material at the annulus at L5-S1 and immediate severe pain.

On June 19, 1998, Plummer had back surgery. She had an anterior and posterior surgical fusion between the L4 and the sacrum.

Plummer next submitted a claim for disability benefits to CNA. On July 21, 1999, CNA approved Plummer's claim effective July 20, 1998. The period from July 20, 1998, to January 20, 1999, during which Plummer was receiving disability pay from Kmart, was used to satisfy the Policy's six-month elimination period.

A lumbar CT scan on December 16, 1999, revealed the results of surgical fusion between Plummer's L4 and sacrum. The CT also indicated that there may be centrally located clumped nerve roots or other soft tissue lesion in the spinal canal at the L4 and L5 levels.

Plummer was seen by Dr. Gilliotte several times during the year 2000. Each time Dr. Gilliotte found that Plummer continued to be disabled. Specifically, on September 15, 2000, Dr. Gilliotte reported to CNA that Plummer's function had not improved and that it would never improve enough for her to return to full time work.

CNA then scheduled Plummer for an FCE to be conducted on November 15 and 16, 2000. The FCE was discontinued on the first day due to the pain being experienced by Plummer.

---

[6]Plummer, of course, was a pharmacist and not a registered nurse.

Following the FCE, Dr. Gilliotte again told CNA that there had been no improvement in Plummer's condition and that future improvement was uncertain.

In February of 2001, Plummer applied for and received Social Security disability benefits. The Social Security Administration determined that Plummer became disabled on July 20, 1998, and was entitled to begin receiving benefits in February of 2000.

Dr. Gilliotte again evaluated Plummer in September of 2001. He concluded that she could not perform full time work and that she continued to have severe limits to her ability to sit, stand, walk and concentrate.

In October of 2002, CNA offered Plummer a lump sum to settle her disability claim. She did not accept this offer and continued on disability insurance.

In late 2003, Hartford assumed responsibility for administration of the Policy and thus for administration of Plummer's claim. Hartford concluded that, while there was evidence supportive of Plummer's disability, it was minimal. It then requested that Plummer provide a work and education history and a current APS. Plummer also submitted a Disability Claim Form in which she reported that she could not return to work until a new technique is developed to decrease pain and increase mobility.

In June of 2004, Hartford again asked Plummer for a periodic update. Plummer responded with a Claimant Questionnaire and an APS. Plummer reported that she had arachnoiditis and severe back pain that there had been no change in her condition. The APS confirmed Plummer's report and noted that no treatment is available for this condition. Plummer also indicated that she had seen Dr. Fronista and Dr. Snow within the past 18 months.

After receiving Dr. Fronista's office records for Plummer since January 2003, Hartford referred Plummer's claim to its SIU as a "proactive" claim. The SIU then had surveillance of Plummer conducted on two different occasions in August and September of 2004 followed by an interview conducted by one of the SIU's investigators.

Plummer was not observed outside her residence on the first two days of the initial surveillance and was observed outside her residence for approximately thirty-nine minutes on the third day. Of the thirty-nine minutes, almost six minutes were captured on video and Plummer was shown for the entire six minutes. On the third day, Plummer was observed and videotaped driving, walking, entering and exiting her vehicle, squatting, bending at the waist, reaching, lifting and pushing a shopping cart.

Hartford then requested a second surveillance which was conducted approximately one month later. On the first day of this surveillance, Plummer was not observed outside her residence. On the second day, she was observed away from her residence for about two hours. Of the two hours, twelve minutes was captured on video and, of the twelve minutes, Plummer is seen for almost seven minutes. During this time, she was observed and videotaped walking, bending at the waist, carrying a baby in a car seat, reaching and pulling, and driving.

Following the surveillance, Plummer was interviewed by an SIU investigator. Plummer indicated that she had been watching her granddaughter during the surveillance because the child's mother had been beaten by the father of the child. Plummer told the investigator that she could not return to work because of severe pain caused by arachnoiditis. She also told the investigator that she could bend and twist at the waist, squat, kneel and reach to the front and

-30-

side but that she could only walk for about twenty or twenty-five minutes, stand for fifteen to twenty minutes and lift and carry items weighing less than five pounds.

Hartford then sent copies of the surveillance to Dr. Fronista. The record does not include a response.

Hartford next scheduled an IME for Plummer with Dr. Klein. Dr. Klein examined Plummer and the medical records that were provided by Hartford. The records initially provided by Hartford did not include the surveillance.

Dr. Klein concluded that Plummer was credible and had ongoing pain. He also concluded that she would presently be classified in the sedentary job classification.

After receiving this report from Dr. Klein, Hartford then sent him copies of the two surveillance videos. Without again seeing Plummer, Dr. Klein issued an addendum report in which he indicated that Plummer is capable of performing at a higher level than she presented to him earlier, that Plummer was capable of lifting up to ten pounds and was capable of standing and walking about as needed on a frequent basis. This, according to Dr. Klein, would put Plummer in the light duty classification and capable of performing the duties of a pharmacist.

Hartford next sent Dr. Klein's report and the addendum thereto to Dr. Fronista. Dr. Fronista responded that he had been treating Plummer for the usual colds and a bout with pneumonia and that he does not involve himself with her back problems that have been treated by others.

Hartford then decided to terminate Plummer's long term disability benefits effective February 1, 2005. This decision, according to Hartford, was based upon Dr. Klein's IME and the

surveillance. Hartford concluded that Plummer could perform three occupations: Pharmacist, Pharmaceutical Sales Representative and Quality Assurance-Pharmaceuticals.

Plummer then went back to Dr. Gilliotte. Dr. Gilliotte examined Plummer and her medical records and concluded that she had stable chronic back and leg pain and that she was not physically capable of work. He also reported that Plummer was seeing Steve White, a counselor, to help with some psychological adjustments.

Next, Plummer appealed Hartford's decision to terminate her long term disability benefits. Along with the appeal, she submitted Dr. Gilliotte's latest report and a brief report by Steve White, both of which concluded that Plummer was fully disabled.

Hartford then sent Plummer's medical records to Dr. Marks for a record review. Hartford also sent Plummer's psychological records to Dr. Zakin for a record review. The surveillance videos were sent to both of these doctors.

Dr. Marks reviewed the records, spoke with Dr. Gilliotte and concluded that Plummer was capable of performing the activities of a light work classification which entails lifting of up to twenty pounds and some walking and standing. Dr. Gilliotte told Dr. Marks that even patients with chronic back pain can perform tasks in an emergency which they normally could not perform.

Dr. Zakin reviewed Plummer's records, spoke with Steve White and concluded that the video tape indicates under-reporting of symptoms. Mr. White told Dr. Zakin that Plummer was unable to perform any type of work at the time based upon major depression. However, Dr. Zakin noted that Mr. White's treatment notes do not document any significant problems with concentration or memory and that no cognitive testing had been performed. Dr. Zakin concluded

that there was no objective medical evidence that Plummer's depression is severe enough to cause occupational impairment.

After receiving the reports from Dr. Marks and Dr. Zakin, Hartford denied Plummer's appeal. Plummer then filed the complaint that is now before the Court.

**B.      Analysis of Hartford's Decisions**

The basis for analyzing Hartford's decisions will first be set forth. This will be followed by an analysis of the decisions.

**1.      Basis for Analysis**

Hartford's decision to terminate Plummer's long term disability benefits is reviewed de novo. Therefore, the Court must decide whether or not it agrees with Hartford's decision. In doing so, the Court must determine, based upon the administrative record provided by the Parties, whether Hartford properly interpreted the Policy and whether Plummer is entitled to long term disability benefits.

The first issue to be addressed is which Policy definition of disability is to be applied. CNA and Hartford's correspondence indicates that the Policy's "own occupation" definition of disability applies for the first 24 months and the "any occupation" definition applies thereafter. While this may be what the Policy says, it is not what the "Summary of Benefits" given to the employees says.

The definition of disability given to the employees indicates that the "any occupation" provision applies after the "own occupation" provision has been paid for the Insured Employee Occupation Period shown in the Summary of Benefits. However, the Summary of Benefits does

not include an Insured Employee Occupation Period. Therefore, the "own occupation" definition of disability that was communicated to those covered by the Policy will be used.

Plummer is disabled if she is continuously unable to perform the substantial and material duties of her regular occupation, if she is under the regular care of a legally qualified doctor and if she is not gainfully employed in any occupation for which she is or becomes qualified by education, training or experience. Substantial and material duties are the necessary functions of Plummer's regular occupation, and Plummer's regular occupation is pharmacist.

The record includes two job descriptions for a pharmacist. One is a Job Analysis for the Position of Pharmacist prepared by Brubaker Rehabilitation Management, Inc. and the other is Kmart's job description for the position of pharmacist. Both are included in the AR as part of the FCE report. The Job Analysis is a more complete description of substantial and material duties and will be used herein.

**2.      Analysis of Hartford's Decisions**

Having set forth the applicable Policy definition of disability and identified the source of the duties for Plummer's regular occupation, the analysis turns to Plummer's initial disability regarding which there is no reasonable doubt. Plummer was initially disabled.

Plummer ceased working as a Kmart pharmacist on July 20, 1998 with severe back pain. The initial diagnosis was a mild central bulge of the intervertebral disc at the L4-5 level causing minimal impingement on the ventral aspect of thecal sac. However, Plummer's doctors told her that surgery was premature.

Plummer then tried therapy, epidural steroid injections, a warm "N" back brace and chiropractic treatment, and pain management. Plummer continued to be tested and was assessed

by the Greene Memorial Hospital neurosurgical clinic and the Mayo Clinic. She also underwent three IME's.

After trying several potential solutions, undergoing several tests and obtaining several second opinions, Plummer underwent back surgery. The surgery was performed by her orthopedic spine surgeon on June 19, 1998. She had an anterior and posterior surgical fusion between her L4 and her sacrum.

Plummer then applied for and received disability benefits from CNA pursuant to the Policy. At the time Dr. Seymour, Dr. Gilliotte, Dr. Brown and Dr. King had all concluded that Plummer was disabled.

Plummer continued to see Dr. Gilliotte through 2001. He reported that she was disabled during this time period.

On December 16, 1999, Plummer underwent a post-operation lumbar CT scan of her back. The CT scan revealed the work that had been done as part of the surgery and also revealed that there may be centrally located clumped nerve roots or other soft tissue lesion in the spinal canal at the L4 and L5 levels.

CNA then commissioned an FCE that was conducted on November 15, 2000. However, it was discontinued on the first day and provided no indication that Plummer was able to work.

In February of 2001 Plummer applied for and received Social Security disability benefits. Also, in October of 2002, CNA offered Plummer a lump sum settlement for her disability claim which Plummer declined.

In late 2003, Hartford enters the picture. Hartford assumed responsibility for the administration of the Policy. Upon review of Plummer's file, Hartford found support for her disability since 2001 but termed the support "minimal."

However, the support in the file was not "minimal." The support included clear indication that Plummer had back surgery, was still in pain and was thought to be disabled by several doctors. No reason is given for selecting 2001 as the cut-off, but, given the nature of Plummer's disability, a review of the entire record was appropriate.

Hartford then asked Plummer for additional support for her disability. To this Plummer responded that she was not able to return to work until a new technique is developed to decrease pain and increase mobility.

In June of 2004, Hartford again asked Plummer for what it termed a "periodic update." Plummer responded that she had arachnoiditis and severe back pain and had limited mobility. She also submitted an APS that confirmed that she had arachnoiditis[7] and severe back pain and indicated that no treatment is available for this condition.

Hartford then asked Dr. Fronista for his office records regarding Plummer. Apparently Hartford asked only Dr. Fronista because Plummer had indicated that she had seen only him in the past 18 months. Again, given Plummer's history as presented in the AR, Hartford could have and should have asked other doctors who had treated Plummer.

After receiving Dr. Fronista's records, Hartford referred Plummer's claim to its SIU. The records Dr. Fronista sent to Hartford indicate that he had seen Plummer four times between

---

[7]Arachnoiditis is an inflammation of the arachnoidea. The arachnoidea, in this case, is the membrane covering the spinal cord. William Alexander Dorland, *Dorland's Illustrated Medical Dictionary* 105 (26th ed. 1981)

August 7, 2003, and June 28, 2004, for various reasons and that Plummer was suffering from arachnoiditis.

Hartford's SIU had surveillance conducted on Plummer on two occasions. On the first occasion, she was not seen outside of her residence on the first two days and was observed outside her residence for thirty-nine minutes on the third day. She was only seen on the video taken on that occasion for a short time. However, the surveillance report indicates that Plummer traveled to a nearby cleaners, a fast food restaurant and a department store during which time she was seen driving, walking, entering and exiting her vehicle, squatting, bending at the waist, reaching, lifting and pushing a shopping cart.

The second surveillance occasion was about one month later. The second time Plummer was not observed outside her residence on the first day. On the second day, she was observed outside her residence for two hours and ten minutes. A video was made and Plummer is seen in the video for almost seven minutes. The surveillance report indicates that Plummer traveled to a private residence, to a medical center and then back to her residence during which time she was seen walking, bending at the waist, carrying a baby in a car seat, reaching, pulling and driving.

Hartford's SIU then followed up the surveillance with an interview. Plummer told the interviewer that she had been watching her granddaughter during the surveillance because the child's mother had been beaten by the child's father. She indicated that she was prevented from returning to work because of severe back pain caused by arachnoiditis and that she could not sit or stand for any extended period of time. She also indicated that she could walk for only twenty or twenty-five minutes, stand for fifteen to twenty minutes at most, lift and carry items that weigh less than five pounds and push an empty shopping cart. Finally, she indicated that she

-37-

could bend and twist at the waist, squat, kneel and reach to the front and side. These are all indications that Plummer continued to be disabled. This is what Plummer had been doing during the surveillance and is hardly evidence that she could return to full time employment as a pharmacist.

Hartford then scheduled an IME for Plummer with Dr. Klein. Dr. Klein examined Plummer and reviewed the records that Hartford provided. Dr. Klein concluded that Plummer was credible and had ongoing pain. He also concluded that Plummer was classified in the sedentary job classification meaning that she could lift up to ten pounds but would require frequent shift of body position from standing, sitting and lying.

After reviewing Dr. Klein's initial report, Hartford decided to send the surveillance videos to Dr. Klein. Although they apparently were in Hartford's possession when Dr. Klein conducted his IME, they were not initially provided to Dr. Klein and Hartford has yet to give a reason why the videos were not initially provided.

After seeing the videos and based solely upon the videos, Dr. Klein changed his assessment. He changed his assessment to finding that Plummer was capable of lifting up to twenty-five pounds on an occasional basis, was capable of frequently lifting up to ten pounds and was capable of standing and walking about as needed on a frequent basis. This, according to Dr. Klein, put Plummer in the light duty classification and capable of performing the duties of a pharmacist.

However, Dr. Klein's "re-assessment" is flawed for several reasons. First he initially examined Plummer and determined that she was in the sedentary job classification and then changed his opinion based totally upon the videos which included observance of Plummer for a

total of approximately thirteen minutes. He made no effort to further examine Plummer or contact any of her treating physicians. He also made conclusions regarding the weight she could lift and the frequency with which she could lift it without knowing how much the items she was shown lifting on the video weighed. He also found that the activities of Plummer shown on the video were done "without any seeming difficulty." Yet, he could not know if Plummer was actually experiencing pain. Finally, he concluded, based only upon the thirteen minutes of video, that Plummer could stand and walk as needed on a frequent basis and that she was capable of performing the duties of a pharmacist, duties that include walking for 25% of a work day and standing for 70% of a work day. All of these conclusions are reached in light of the fact that Dr. Klein has a conflict of interest in that he was hired by Hartford and courts have found that companies like Hartford have a clear incentive to contract with individuals who are inclined to find in their favor.

Hartford then sent Dr. Klein's assessment and addendum to Dr. Fronista. Dr. Fronista responded that he had only been treating Plummer for her usual colds and a bout with pneumonia and that he did not involve himself with her back anatomy and physiology.

This was enough investigation for Hartford. Without further review of the extensive records in Plummer's file from her other treating physicians, particularly those who had seen and treated her for her back problems, Hartford decided to terminate Plummer's long term disability benefits. Hartford indicates that they reviewed Plummer's file for employability, but there is no FCE or other formal employability assessment in the AR.

Based upon the administrative record, this is not the correct decision. It is clear that Plummer had and continued to have problems with her back, it is clear that Plummer was being

-39-

treated for back problems by specialists and not by Dr. Fronista, it is clear that Dr. Klein's IME, which is the only doctor's opinion relied upon by Hartford, was seriously flawed, and it is clear that all of the other doctors, except Dr. Klein, thought Plummer could not perform as a pharmacist.

There are also other matters that make this decision questionable. For example, Hartford's letter terminating Plummer's benefits lists only one of the videos as a basis for its decision, yet the letter describes both videos. Also, Hartford was not interpreting the Policy in accordance with the description provided to employees because the letter refers to three possible occupations and only the pharmacist occupation may be used.

With regard to the pharmacist occupation, the job analysis used by Hartford requires standing for 70% of the time and walking for 25% of the time. Yet Hartford relied almost entirely upon a total of thirteen minutes of video to conclude that Plummer could stand and walk for these percentages of an entire work day. This is particularly questionable in light of the results, or lack thereof, of the only FCE conducted by Hartford.

Plummer then appealed Hartford's decision to terminate her long term disability benefits. Along with her appeal, she submitted reports from Dr. Gilliotte and from Steven White, a psychotherapist. Both had recently seen Plummer and both reported that she was fully disabled. Dr. Gilliotte's opinion is particularly relevant because Dr. Gilliotte had initially been hired by CNA to perform an IME of Plummer.

Hartford then engaged consulting physicians to conduct record reviews. Dr. Marks conducted a medical record review and Dr. Zakin conducted a psychological record review.

-40-

Dr. Marks incorrectly concluded that Plummer was capable of performing the activities of a light work level.  He based this conclusion in part on the limited amount of time that Plummer is seen on the videos even though Dr. Gilliotte told him that even patients with chronic back pain can perform certain tasks in an emergency. He also based his opinion in part on Dr. Klein's flawed assessment. Finally, as with Dr. Klein, Dr. Marks's opinion must be viewed in light of the fact that he was hired by Hartford and courts have found that companies have a clear incentive to contract with individuals who are inclined to find in their favor. Dr. Klein's opinion must also be viewed in light of the fact that he did not actually examine Plummer.

Dr. Zakin's opinion addresses a psychological disability. Plummer now argues that she has both a physical disability and a psychological disability.

Dr. Zakin's opinion is also flawed. He reported that the surveillance video indicates under-reporting of symptoms. However, he does not explain nor does the Court understand how Dr. Zakin can make a determination regarding psychological disability, particularly depression, from the thirteen minutes of video. Dr. Zakin supported the diagnosis of an Axis I depressive condition but determined that there was no objective medical evidence thereof. However, as set forth above, the Policy does not require objective medical evidence. Finally, as with Dr. Klein and Dr. Marks, Dr. Zakin's opinion must be viewed in light of the fact that he was hired by Hartford and courts have found that companies have a clear incentive to contract with individuals who are inclined to find in the company's favor. Dr. Zakin's opinion must also be viewed in light of the fact that he did not actually examine Plummer.

After receiving the reports from Dr. Marks and Dr. Zakin, Hartford denied Plummer's appeal. This decision, as was Hartford's initial decision to terminate Plummer's long term

disability benefits, is not well founded. It is based upon very limited video surveillance that is not representative of the actual job and it is based upon flawed medical opinions.

**C.       Analysis of Hartford's Arguments and Briefs**

Hartford raises several arguments regarding Plummer's disability. There are also issues regarding the quality of Hartford's Briefs. Each will be addressed in turn.

**1.       Hartford's Arguments**

Hartford first argues that Plummer has the burden of proving continued eligibility for benefits under the Policy. However, the Policy requires Plummer to submit proof that she continues to be disabled only if asked to do so. In this case, when Hartford asked, Plummer submitted the proof.

Hartford next argues that it was entitled to rely upon Dr. Fronista's response because he was the only medical provider that Plummer identified, when asked, as currently treating her. When Dr. Fronista was then asked to provide objective medical findings that Plummer continued to be disabled, he referred Hartford to those who had treated Plummer for her back problems. Although Plummer did not provide additional objective medical findings regarding her back at that time, there were already plenty of objective medical findings in the AR. Further, Plummer had no further treatment options and relied upon medication until a new medical procedure could improve her condition.

Hartford then argues that Plummer did not provide objective medical findings on appeal. However, Plummer was examined by Dr. Gilliotte prior to her appeal. Dr. Gilliotte reviewed Plummer's medical history, examined her and concluded that she has stable chronic back pain

and leg pain. He reported that she continued to be disabled. The evidence of disability that is in the AR prior to the appeal combined with Dr. Gilliotte's findings is enough.

Hartford next argues that the only information in the AR that could support a finding of disability are records indicating that Plummer underwent surgical procedures prior to 2003 to resolve problems she was experiencing. While the AR indicates that Plummer underwent surgical procedures prior to 2003, there is much more. The AR indicates that Plummer continued to experience arachnoiditis and severe back pain and had limited mobility. The AR also indicates that Plummer was suffering from depression. Finally, several doctors thought Plummer continued to be disabled after her back surgery.

Hartford next argues that Plummer is not entitled to disability benefits for depression because she did not identify depression as a basis for her claim. The Court is unable to verify this statement because a copy of Plummer's initial claim was not provided by Hartford. However, assuming that it is true that Plummer did not identify depression as a basis for her initial claim, she may do so at a later date and has done so.

In *Kalish*, the Sixth Circuit found that a mental illness triggered by a physical injury and discovered after the initial application for benefits for the physical injury must be considered by the insurer. 419 F.3d at 512. The *Kalish* court also distinguished *Bishop v. Metropolitan Life Insurance*, 70 Fed. Appx. 305 (6th Cir. 2003), one of the cases cited by Hartford for support, because the plan administrator in *Bishop* fully considered the claimant's evidence of depression. *Id.* at 511.

In *Wadyal v. Metropolitan Life Insurance Co.*, 2003 WL 22846229 (N.D.Cal. Nov. 24, 2003) a case cited by Hartford for further support, the insured did not seek disability for

depression until after a decision on the final appeal had been issued. That is not the case here. Here, there is medical evidence in the record beginning in 1999 that Plummer was depressed and there are objective medical findings in the record before Hartford's decision on Plummer's appeal.

Hartford also cites *Maniatty v. UnumProvident Corp.*, 218 F.Supp.2d 500 (S.D.N.Y. 2002), *aff'd*, 62 Fed.Appx. 214 (2d Cir. 2003), in support of its argument that Plummer's disability due to depression is not entitled to consideration because it was not listed on her initial application. However, the court in *Maniatty* found that the claimant could not raise evidence of additional disabilities at the final appeal for the first time. However, in this case, the AR includes indications that Plummer was suffering from depression as early as 1999.

Assuming that its argument, or post hoc rationalization, that Plummer's depression could not be considered would fail, as it did, Hartford next argues that Plummer did not submit "Objective Medical Evidence" supporting total disability due to depression. However, Hartford has again misread its Policy. The Policy requires "objective medical findings" which are defined as tests, procedures, or clinical examinations. Plummer submitted results of clinical examinations by Steven White and others who reported that she was suffering from depression.

Hartford next argues that it was entitled to rely upon the opinions of the independent medical examiner and the two medical reviewers that it hired. This may be the case in some situations. However, as determined above, in this case all three of these opinions that Hartford relied upon were seriously flawed and all of the other opinions indicate that Plummer is disabled.

Hartford next argues that it is not bound by the Social Security Administration's disability determination. Again, while this may be the case, there are several other concurring

medical opinions, both before and after the Social Security Administration's determination, that Plummer is disabled.

Hartford next makes much of the fact that Dr. Fronista declined to discuss Plummer's disability due to back problems. However, Dr. Fronista clearly told Hartford that other specialists, and not he, were treating Plummer for her back problems and there are adequate objective medical findings in the AR by those specialists.

Hartford next argues that Plummer cannot rely upon medical records concerning treatment she received between 1998 and 2002. However, Hartford offers no support for this bald assertion. Also, Dr. Marks, one of the medical reviewers hired by Hartford relied on them. Finally, there are adequate medical records concerning examinations and treatment that Plummer received after 2002.

Hartford next argues regarding Plummer's psychological conditions that "Plummer's after the fact attempt to allege a new basis to support a finding of disability" is "disingenuous." However, perhaps it is Hartford that is "disingenuous." There are indications on the AR beginning in 1989 that Plummer was suffering from depression and Plummer submitted additional objective medical findings regarding depression as part of her appeal.

Hartford finally argues that Plummer improperly accuses Hartford of making a committed effort to deprive her of her disability benefits. However, the AR includes evidence from which Plummer could reasonably reach this conclusion. She was found to be disabled by several doctors, the Social Security Administration and even CNA. CNA went so far as to offer Plummer a lump sum to settle her claim. Then, as soon as Hartford arrived on the scene, they called in their SIU including surveillance and a recorded interview. The SIU investigation was

followed by flawed assessments by Hartford's doctors, based primarily on thirteen minutes of video, that she was not disabled.

**2.      Hartford's Briefs**

Attorneys have a responsibility to advocate for their clients. However, that responsibility does not go so far as to permit misstatement of the law or the facts to the court.

The Court normally would not address this issue sua sponte. However, in this case the frequency of misstatements and the time burden placed on the Court to ascertain the correct law and facts are too great. Without reaching conclusions on the misrepresentations in Hartford's briefs at this time, the Court will identify some of the instances where Hartford's counsel may have gone beyond merely advocating for its client.

First, Hartford misstated the law regarding the standard of review. Had additional research been done, Hartford would have discovered that the case it cited did not base an arbitrary and capricious review on the language that Hartford cited to the Court.

Next, Hartford conveniently misstates the Policy requirements regarding proof of disability. The Policy requires "objective medical finding." and defines what are considered objective medical findings. Yet, Hartford uses such terms as "objective medical information," "objective medical proof," "objective medical evidence," and "objective medical support" in its Briefs.

Next, Hartford indicates that Plummer's claim was examined as part of its "annual review process." Yet there is no evidence in the AR of an annual review process. There is, however, evidence of a "proactive" review and investigation.

Next, Hartford says that Investigator Snow witnessed Plummer during the surveillance. Yet, the surveillance was conducted by two unnamed individuals that worked for the firm hired by Hartford to conduct the surveillance and not by Snow. The record includes no surveillance conducted by Mr. Snow. The record does, however, include surveillance conducted on August 14 and 15 by "Investigator #101" and surveillance conducted on September 12 and 13 by "Investigator #109."

Next, Hartford says the only information in the AR that could support a finding of disability are records indicating that Plummer underwent surgical procedures prior to 2003. As indicated above, this is simply not true.

Next, is the issue of disability due to depression. Hartford's argument that Plummer could not raise depression as a disability unless she raised it at the time of her application or showed that it existed at the time of her application appears to be a post hoc rationalization and is a clear and blatant misstatement of the law as it applies to this case.

Next, Hartford says that Dr. Gilliotte's explanation that Plummer was able to care for her grandchild in an emergency situation fails to explain her ability to run errands for "several hours… ." However, the surveillance does not show that Plummer ran errands for "several hours." In fact, the surveillance shows that Plummer did not leave her residence for most of the hours when the surveillance was being conducted.

Next, Hartford indicates that the Policy "required Plaintiff to submit continuing objective medical findings of her disability …" This is misleading because the Policy only requires that continuing medical findings be provided if requested.

Next, Hartford indicates that "Plaintiff's after the fact justifications and explanation of the events depicted on the videotape and her alleged debilitating pain thereafter are not part of the administrative record and cannot be considered by the Court. First, it seems logical that any explanation would be offered after the fact, that is, after it was asked for or needed. But, more importantly, Plummer's explanation is part of the AR and the AR must be considered by the Court.

Next, Hartford says that the activities performed by Plummer during the surveillance and not the number of minutes captured on video should be the Court's focus. Yet, the pharmacist job description used by Hartford requires Plummer to perform certain activities for certain percentages of the minutes or hours in a work day.

Finally, and clearly the most troubling, the AR is incomplete and presumably the items missing were in the hands of Hartford. For example, certain pages are apparently missing and one page between PLUM 670 and 671 is not Bates stamped. Also, at least one of Plummer's applications is missing and the Occupational Evaluation referred to in Hartford's letter terminating Plummer's long term disability benefits is missing.

D.    **Conclusions**

There is evidence in the AR that Plummer is both physically and psychologically disabled in accordance with the Policy and Hartford's decision to terminate Plummer's disability benefits is not well founded. Therefore, Plummer's Motion for Judgment On the Administrative Record is GRANTED and Hartford's Motion for Judgment On the Administrative Record is OVERRULED. Hartford is order to provide long term disability benefits to Plummer plus interest from the date on which Hartford ceased paying the long term disability benefits. *See*

*Calvert*, 409 F.3d at 297. Hartford is ordered to pay these benefits for as long as Plummer remains disabled under the terms of the Policy.

Plummer is given until not later than thirty days from entry of this Order to submit a motion requesting any attorneys' fee and other benefits to which she may believe that she is entitled under ERISA. This motion should be supported by appropriate evidence and reference to legal authorities.

**DONE** and **ORDERED** in Dayton, Ohio, this Fifth day of January, 2007.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record